## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

**JOHANNA GEORGIA,**

*Plaintiff,*

v.

**CITY OF BRIDGEPORT,**

*Defendant.*

No. 3:19-CV-00234 (VLB)

August 10, 2020

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT [ECF No. 27]

Plaintiff Johanna Georgia brings this action raising claims that Defendant City of Bridgeport failed to provide reasonable accommodations for her disabilities under the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.* Defendant moves for summary judgement pursuant to Federal Rule of Civil Procedure 56 [ECF No. 27]. For the reasons set forth below, the Court GRANTS the motion in part and DENIES it in part.

## I. BACKGROUND

The Court takes the following facts from the evidence cited and statements of material facts submitted by the parties pursuant to Local Rule 56[1]. They are read in the light most favorable to the non-moving party.

---

[1] Defendant has not complied with its obligations under D. Conn. L. Civ. Rule 56(a). Defendant's submissions fail to meet the Local Rule 56(a)(3) "specific citation" obligation, which "requires counsel . . . to cite to specific paragraphs when citing affidavits or responses to discovery requests and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length." Nevertheless, the Court will consider its motion on the merits.

Johanna Georgia ("Plaintiff") began working for the City of Bridgeport ("Defendant") as a firefighter in 1999. [ECF No. 27-1 ¶ 1]. Plaintiff's "allergy induced respiratory asthma" first appeared during firefighter training in 1999. [ECF No. 27-1 (Def.'s Statement of Facts) ¶¶ 4-5]. During her time working for Defendant before August 2016, Plaintiff had been assigned to Engine 16 for approximately seven-to-eight years. Plaintiff had no "uncontrolled allergic asthma conditions or additional health reactions" during this period. [ECF No. 27-1 ¶¶ 9, 35].

A. **Assignment at Headquarters**

On August 3, 4, 6, and 8, 2016, Plaintiff worked shifts at Headquarters, the women's quarters at which according to Plaintiff were "rife with unhealthy contaminants" that triggered a severe asthma attack. [ECF No. 27-1 ¶¶ 11-12]. Plaintiff states that, during her August 3 shift, she complained about the conditions to the "officer on duty." [ECF No. 27-1 ¶ 16]. There is no record of any complaint by Plaintiff on that day, though Plaintiff notes this is the responsibility of the officer in charge, not hers. [ECF No. 27-1 ¶ 17; ECF No. 34 (Pl.'s Opposition Material Facts) ¶ 17].

Plaintiff took off sick from August 12 to 26, 2016, due to a "throat infection" which she states was caused by the conditions at Headquarters. [ECF No. 27-1 ¶¶ 12-13]. Plaintiff never provided Deputy Chief Lance Edwards with any medical documentation of this illness explaining that it resulted from the conditions at Headquarters. [ECF No. 27-1 ¶ 20].

Deputy Chief Edwards's job duties include "monitoring fire department employees who are out sick and/or injured to ensure that proper Departmental operations are maintained and to effectively control the benefits provided by

Bridgeport to Department employees." [ECF No. 27-1 ¶ 3]. Plaintiff states that Deputy Chief Edwards, in his official capacity, had access to her "'documented health issues considering workplace environmental factors' . . . [and] should have inferred a likely causal connection" between the conditions at headquarters and her asthma flare-up. [ECF No. 34 ¶ 20].

On August 26, 2016, Richard Thode, Chief of the Bridgeport Fire Department, ordered transfers based on operational needs, as he does "[o]n a regular basis." [ECF No. 27-1 ¶¶ 2, 21, 22]. He transferred Plaintiff from Engine 16 to Headquarters. [ECF No. 27-1 ¶¶ 2, 22].

The next day, August 27, Plaintiff reported for duty at Headquarters and complained to the battalion chief on duty about the conditions in the women's quarters. [ECF No. 27-1 ¶ 25]. Two days later, on August 29, Plaintiff's concerns were acknowledged by Chief Thode through Chief Carfi, who in an email transferred Plaintiff to an opening at Engine 10. [ECF No. 27-1 ¶ 26]. The email stated:

> Thank you for bringing the issues with the woman's quarters at Fire Headquarters to our attention. A female firefighter has not been assigned to Headquarters for some time now, and apparently no one has taken notice of issues regarding mold. As you are aware, after several delays, the roof is in the final stages of being replaced. Now that rainwater will no longer be leaking into the station, we are taking actions to address the damage caused by the leaks. We have experts coming in to assess the issues and we will take corrective actions. With all this taken into consideration, and your documented health issues considering workplace environmental factors, I feel that the best course of action is to transfer you to an opening that we have at Engine-10-A. Station 10 is the newest fire station in our department. It is better equipped to deal with the workplace environment than any of the older stations. Thank you for your patience and we will continue to make every station a safe environment for all members.

[ECF No. 27-1 Ex G (Email between Plaintiff and Carfi, Aug. 29, 2016); ECF No. 34-4 (Emails between Carfi and Plaintiff, Aug. 29, 2016)].

Plaintiff replied that same day thanking Chief Carfi for the change and stating, "I hope to be able to better maintain my health at the 10s and your consideration in this matter is greatly appreciated." [ECF No. 27-1 ¶ 27].

As a result of Plaintiff's complaint, on the day of her transfer, the City Health Department Environmental Division inspected the women's quarters at Headquarters for mold. [ECF No. 27-1 ¶ 31]. Though the inspector noted that there didn't "appear" to be any mold in the women's quarters, he could neither "confirm [n]or deny" its existence and recommended "air testing in the room for an analytical determination and confirmation of mold existence." [ECF No. 27-1 Ex H (Email from Petrucelli to Dept., Sept. 1, 2016)]. Three months later, in an email, whose subject line read "Mold Remediation at Fire Headquarters" dated December 1, 2016, Deputy Chief Robert Petrucelli notified "[a]ll Companies, Battalions, and Divisions" of the following:

> Now that the roof has been replaced at Fire Headquarters, the process of mold remediation will begin… The kitchen will be closed and off limits for at least one full week…[W]e are trying to address and correct the mold issues in the Firehouse caused by years of water leaks from the previous roof.

[ECF No. 34-5 (Petrucelli's December 1, 2016, Email)].

B. September 30th, 2016, Request to Transfer to Engine 16

On September 30, 2016, Plaintiff sent a certified letter to Deputy Chief Edwards formally requesting an ADA accommodation pursuant to her asthma illness. [EFC No. 27-1 ¶ 34]. In the letter, Plaintiff requested a reassignment from Engine 10 to "Firehouse 16, a physical location where I worked for approximately eight years without uncontrolled allergic asthma conditions or additional health reactions." [ECF No. 27-1 ¶ 35 & Ex. I (Plaintiff's letter to Edwards)]. If Defendant did not find that to be a 'reasonable accommodation,' Plaintiff asked that she

"remain at Firehouse 10s with exclusion from the Bridgeport Fire Department sick leave and absence control policy." [ECF No. 27-1 ¶ 36 & Ex. I]. The letter contained no medical information, but Plaintiff asked that Edwards let her know if "additional medical documentation" of her condition was required or if he "wish[ed] to propose alternative accommodations. . . ." [ECF No. 27-1 ¶¶ 37-38]. Plaintiff continued, "I am ready and willing to engage in an interactive process with you so that I may continue in my employment." [ECF No. 27-1 ¶ 37].

On October 6, Deputy Chief Edwards emailed Plaintiff to notify her that he had received her letter and that it had been "sent to the proper parties to make that determination." [ECF No. 27-1 ¶ 39]. Pursuant to the City of Bridgeport's ADA policy, Plaintiff's request was sent to the City of Bridgeport Labor Relations Department. [ECF No. 27-1 ¶ 40-41].

On October 26, Director of Labor Relations Janine Hawkins notified Plaintiff via certified letter that she had received the ADA accommodation request. [ECF No. 27-1 ¶ 42]. The letter included four forms for Plaintiff to complete: ADA Accommodation Request Procedures and Acknowledgement; ADA Accommodation Request Form;  Consent to Release Information ("medical release"), [ECF 27-1 ¶ 57]; and ADA Physician's Statement. [ECF No. 27-1 ¶ 44]. Hawkins stated in the letter: "Your request will be reviewed once all forms have been received." [ECF No. 27-1 Ex M (Hawkins' October 26, 2016, letter to Plaintiff)]. The medical release "authorizes the doctor of an employee seeking an accommodation permission to disclose to the ADA Coordinator for the City of Bridgeport information regarding the 'diagnoses, prognosis, and physician summary statement of the medical condition.'" [ECF 27-1 ¶ 57];

On November 23, 2016, Plaintiff sent a certified letter containing the ADA documents and Physician Statement, but not the medical release, in response and states she received notice of signed receipt on November 23, 2016.[2] [ECF No. 27-1 ¶ 40; ECF No. 34 ¶ 50]. In this letter, Plaintiff raised "concerns about her medical privacy," and stated: "I have declined providing a medical release as I am able to access my physician to clarify any resulting questions that will facilitate this process and my physician has successfully completed the Policy questionnaire regarding my medical condition and accommodation." [ECF No. 27-1 ¶ 51]. Hawkins states she never received the letter from Plaintiff. [ECF No. 27-1 ¶ 51]. On November 30, 2016, Deputy Chief Edwards forwarded Hawkins the letter and enclosures he had received from Plaintiff. He had received—and Hawkins therefore had—only Plaintiff's letter and ADA documents, but neither a copy of the ADA Physician Statement nor the medical release. *Id.*

On January 12, 2017, Hawkins sent a letter to Plaintiff explaining the City's confidentiality practices with regards to medical information/documents and noting that Plaintiff had not provided her with the ADA Physician's Statement or the medical release. [ECF No. 27-1 ¶ 69]. Hawkins concluded the letter by stating that "a determination as to the approval of you [sic] accommodation request will be addressed upon the receipt" of those documents. [ECF No. 27-1 Ex T (Hawkins's January 12, 2017, letter to Plaintiff)].

On January 16, 2017, Plaintiff responded to this letter via email. [ECF No. 27-1 ¶ 70]. Plaintiff's email explained: "I still decline to provide a Medical Release as my physician has readily provided the ADA statement and I am able to have him answer any direct medical questions that may arise during this process."

---

[2] Plaintiff has not provided this receipt on the record.

[ECF No. 27-1 ¶ 71]. Plaintiff also said she would send another copy of the ADA Physician's Statement it by mail.

The next day, Plaintiff sent Hawkins the ADA Physician Statement photocopy. [ECF No. 27-1 ¶ 72]. In the ADA Physician Statement, Dr. Kenneth Backman explained that Plaintiff's "asthma [was] triggered by allergies worsened by multiple firehouses and workplaces[. And h]as been much worse since [she was] transferred out of firehouse 16." [ECF No. 27-1 Ex V (ADA Physician Statement)]. He further explained that Plaintiff's "asthma and shortness of breath impede [her] ability to perform [the] duties of [her] job" and requested that Plaintiff "transfer back to firehouse 16" because her condition "was much better" there. [ECF No. 27-1 Ex V].

Hawkins claims that, at the time, she "still had several questions that she needed addressed in order to consider . . . [Plaintiff's] accommodation request." [ECF No. 27-1 ¶ 76]. These questions included:

> [H]ow long plaintiff's claimed condition was going to last, its future prognosis and the basis for his statement that the City's multiple firehouses/workplaces caused plaintiff's condition; as well as the basis supporting Dr. Backman's assertion that plaintiff should be transferred to Firehouse 16 when in fact Firehouse 10 where plaintiff was currently working was the newest firehouse.

[ECF No. 27-1 ¶ 76].

Hawkins also wanted Dr. Backman's input on whether he "felt it was a good idea to wait for the results" of the firehouse air testing, then ongoing, "when considering plaintiff's accommodation." [ECF No. 27-1 ¶¶ 77-78]. She could not "seek… information on these questions and issues by… communicating with… Dr. Backman" because Plaintiff had not provided the medical release. [ECF No. 27-1 ¶ 79]. Defendant cites the lack of medical release as the reason that, "for several weeks[,] nothing happened regarding . . .

7

[Plaintiff's] accommodation request." [ECF No. 27-1 ¶ 80]. But Hawkins never relayed any questions or requests for information to Plaintiff. *See generally* [ECF No. 27-1; ECF No. 34 ¶ 78].

In March 2017, Hawkins assigned one of the Labor Relations Department's Human Resource Generalists, Eric Amado, to assist her on Plaintiff's accommodation request. [ECF No. 27-1 ¶ 85].

On March 17, Plaintiff sent an email to both Amado and Hawkins requesting an update on her accommodation request, as she had heard nothing since January. [ECF No. 27-1 ¶ 85; ECF No. 34 ¶ 87]. In her email, Plaintiff noted that her "physician has been ready to address any further inquiries" that may have arisen "following his Medical Statement." [ECF No. 27-1 Ex Y (Emails between Amado and Plaintiff)].

Amado replied the same day, acknowledging that Plaintiff's asthma "qualifies under the ADA" but that indoor air quality testing at Engine 16 on December 13, 2016 indicated low levels of "Alternaria (common allergen)." Amado explained that while this allergen does "not pose harm in low concentrations . . . [it has] the potential to be [an] irritant[] and allergen[] to those with a clinical history of allergy and asthma." [ECF No. 27-1 Ex Y]. He continued, "it would not be appropriate or safe to relocate [Plaintiff] . . . to a location (Firehouse # 16) where . . . [she] may be exposed to allergens" and that "some time ago," a request to "perform air-quality testing in more fire house stations [was made] in order to determine which Fire House has the least potential exposures and is safest" for Plaintiff. *Id.* Amado concluded that he would follow up with those responsible for requesting testing again, and that he "hope[d] to be in touch with [Plaintiff] . . . very soon." [ECF No. 27-1 Ex Y]. On March 20, 2017,

Amado forwarded this email to Edwards, requesting that Edwards let him know "as soon as . . . the OSHA results for the site [at which Plaintiff] . . . is currently stationed" were received. [ECF No. 27-1 Ex Y]. Amado did not request any information or documentation from Plaintiff. *See generally* ECF No. 27-1 Ex Y. Plaintiff did not respond to Amado's email with any updated information from her doctor regarding her request for an accommodation. [ECF No. 27-1 ¶ 98].

Between Plaintiff's assignment to Engine 10 on August 29, 2016, and her ultimate transfer to Engine 16 on May 20, 2017 [ECF No. 27-1 ¶ 102], Plaintiff "reported out sick on… September 21-25, 2016 (Ear Infection); January 6-7, 2017 (Asthma); April 13-17 (sinus infection); and May 19, 2017 (Shoulder pain/tendonitis)." [ECF No. 27-1 ¶ 81]. Plaintiff notes, however, that she also "used vacation/personal leave during this time frame to recover from ongoing health conditions caused by the environmental conditions at Firehouse 10 and increased medications, which affected her respiratory and immune systems. . . ." [ECF No. 34 ¶ 81; Plaintiff's Aff. ¶ 18]. Plaintiff provided no documentation to Defendant indicating that the sick days she used were for "asthma/allergies or caused by the conditions" in Headquarters or Engine 10. This was in adherence with department procedure, which does not require documentation for the use of two days' sick leave. [ECF No. 27-1 ¶ 82; ECF No. 34 ¶ 82].

## C. Transfer to Engine 16

On May 11, 2017, pursuant to her union contract, Plaintiff bid to fill an open firefighter position on Engine 16. [ECF No. 27-1 ¶ 100]. The bid was granted "because of her seniority within the . . . Department" and Plaintiff was transferred to Engine 16 on May 20. [ECF No. 27-1 ¶¶ 100, 102].

After Amado's March 17, 2017 email, Hawkins, Amado and Deputy Chief Edwards sent no further mail to Plaintiff until June 1, 2017. That day, Hawkins sent Plaintiff a letter addressing Plaintiff's ADA accommodation request and her transfer. *See* ECF No. 27-1 ¶¶ 102-03. The letter reiterated that, although Plaintiff's condition qualified as a disability under the ADA, it was "not appropriate or safe" to relocate Plaintiff to Engine 16 as Plaintiff requested because as she "may be exposed to allergens" there. [ECF No. 27-1 ¶ 105; ECF No. 27-1 Ex AA (Hawkins's June 1, 2017, letter to Plaintiff)]. Hawkins repeated the results of the December 2016 Engine 16 air-quality tests, and provided the results of the air quality test performed on Engine 10 on March 31, 2017 that the department had received on May 4: "Quantities of indoor total spore concentrations were lower than concentrations found outdoors. The total concentrations of airborne fungal genera were non-detectable." [ECF No. 27-1 Ex. AA; NN (Emails between Amado and Plaintiff, August 29, 2017)]. Hawkins stated that, although Plaintiff was entitled to remain at Engine 16, "based on the objective measured results," her "ADA accommodation has been provided for with [her] assignment to Fire House, Station # 10." [ECF No. 27-1 ¶¶ 108-09]. Plaintiff did not receive this letter, and emailed Amado on August 29 to follow up on the status of her request. [ECF No. 27-1 Ex NN]. In his reply, Amado attached copies of the letter and the results of the air quality testing performed at various firehouse sites. [ECF No. 27-1 Ex NN].

Plaintiff has remained at Engine 16 from her transfer on May 20, 2017, to present, and her "breathing and health issues have improved." [ECF No. 27-1 ¶ 110; ECF No. 27-1 Ex NN].

D. <u>Shoulder Injury</u>

Consisting of a shoulder harness and an air tank, Self Containing Breathing Apparatus (SCBA) units are "used by firefighters when they go into burning buildings or similar dangerous situations where breathing may be compromised." [ECF No. 27-1 ¶ 119]. Before 2016, the SCBA units used by Bridgeport Fire Department were known as the "Scott 75." [ECF No. 27-1 ¶ 120]. From 2016 to 2018, the Bridgeport Fire Department undertook a gradual transition to a different unit, the "X3," to comply with National Fire Protection Association (NFPA) standards. [ECF No. 27-1 ¶¶ 120-21]. Among other differences, the X3 has "swivel shoulder straps for more ergonomic weight distribution" and weighs 8.5 ounces more than the Scott 75. [ECF No. 27-1 ¶¶ 121-23].

E. **Plaintiff's Use of the X3 at Engine 10**

Firefighters in Engine 10 were already using the X3 units when Plaintiff was transferred there on August 29, 2016. [ECF No. 27-1 ¶ 127]. By the time Plaintiff transferred out to Engine 16 on May 20, 2017, she had been using the X3 for nearly nine months. [ECF No. 27-1 ¶¶ 128-29].

On May 16, 2017 Plaintiff emailed Deputy Chief Edwards with a medical note from the Shelton Urgent Care Center. [ECF No. 27-1 Ex CC (Plaintiff's May 16, 2017 Email to Edwards); ECF No. 27-1 Ex DD (Note from Shelton Urgent Care Center)]. Plaintiff had come to the office because of an injury to her left shoulder that occurred the previous day, on May 15, which related to a pre-existing condition, "[l]eft shoulder dislocation with surgical repair [in] 2005." *Id.*

Two days later, on May 19, Plaintiff was out sick for "[s]houlder pain/tendonitis." [ECF No. 27-1 ¶ 81]. Plaintiff states she informed Deputy Chief Edwards on the evening of May 15, 2017, of her injured shoulder. She states that

Deputy Chief Edwards "called Firehouse 10 repeatedly to pressure . . . [her] into altering . . . [her ] First Report of Injury Statement which was to be filed with the [D]efendant's workers' compensation administrator, PMA and the State of Connecticut Workers' Compensation Commission." [ECF No. 34 Pl.'s Aff. ¶ 35-36]. The report, "Bridgeport Fire Department Report on Sickness-Injury," for this absence does not state that the pain in Plaintiff's shoulder was caused by the X3 unit. Plaintiff claims there is no space on the form to do so. [ECF No. 27-1 ¶ 138; ECF No. 34 ¶ 138].  This report initiated a Workers Compensation action, which was pursued separately throughout this time period.

F. <u>Initial Request for SCBA Accommodation</u>

Firefighters in Engine 16 were still using the Scott 75 when Plaintiff was transferred there on May 20, 2017. [ECF No. 27-1 ¶ 128]. Engine 16 did not begin using X3 units until "April/May 2018." [ECF No. 27-1 ¶ 145].

On August 23, Plaintiff sent an email to Deputy Chief Edwards notifying him of a "medical recommendation for equipment use from LOD PMA Orthopaedic [sic] Surgeon following ongoing medical evaluation and continued treatment." [ECF No. 27-1 Ex GG (Plaintiff's August 23, 2017, Email to Deputy Chief Edwards)]. Attached to the email was a jpeg of a doctor's note written by Dr. John Daigneault, stating: "[Plaintiff] is being treated by me for a right shoulder injury and as a result, must use only the older model SCBA harness whereas the bulk of the weight distribution remains off her shoulders and on her hips. Any questions, please feel free to contact me." [ECF No. 27-1 ¶ 131; ECF No. 27-1 Ex HH (Dr. Daigneault's Note)].

Defendant states that Edwards, after reading Plaintiff's email, "wanted more information . . . to understand what the problem was so he could maybe provide a solution." [ECF No. 27-1 ¶ 133]. Edwards wondered the following:

> Did . . . [Plaintiff] have trouble wearing . . . [the SCBA unit]? Donning it? Did the fit not seem correct? Did she need more training on the use of the unit and was she wearing it correctly? Was this a permanent request being made or temporary? If temporary how long because Engine 16 was still using the older units. Also, the previous medical note he received in May 2016 (See above SOF ## 115-117) referenced at that time that she was having difficulty with her left shoulder and now the current note said right shoulder.

[ECF No. 27-1 ¶ 133].

Edwards replied to Plaintiff's email the next day, August 24, 2017, stating: "Currently the SCBA harness that's on Engine-16, is the old style. If you could give me more info regarding the issue with the harness I could give you more information."

[ECF No. 27-1 Ex II (Edwards's August 24, 2017, Email to Plaintiff)]. Plaintiff replied later that same day, explaining:

> Yes, the units on Engine 16 are the doctor recommended units to continue to use. There are circumstances where I may not have access to the older SCBA harness, for example if I were to be detailed out of 16's for any reason, in the event the quit is updated or a spare apparatus implemented. In these instances perhaps an assigned harness might be considered."

[ECF No. 27-1 Ex II]. Edwards never replied to this email. *See generally* ECF No. 27-1.

But he did unsuccessfully attempt on at least two occasions to contact Dr. Daigneault. [ECF No. 27-1 ¶ 139-40]. Plaintiff states she was "informed by Dr. Daigneault's office that Edwards had… requested information unrelated to the plaintiff's accommodation request, leading Dr. Daigneault to believe that Edwards was seeking reasons to terminate the plaintiff's employment." [ECF No.

34 ¶ 141]. **Defendant claims Edwards was instead simply following the instructions to call with any questions as indicated on the doctor's August 21, 2017, letter. [ECF No. 27-1 ¶ 142]. Plaintiff notes that because Edwards did not work in the Office of Labor Relations, which handles ADA accommodation requests, he "did not have a role" in processing her request. [ECF No. 34 ¶ 143]. So, her "workers' compensation attorney had every reason to be suspicious about the defendant's agent contacting Dr. Diagneault directly, without first clearing it with him." [ECF No. 34 ¶ 143]. As a result of these suspicions, Plaintiff's workers' compensation attorney sent a letter to the City instructing Edwards to cease contact attempts. [ECF No. 27-1 ¶ 143; ECF No. 34 ¶ 143]. No further contact occurred between Edwards and Plaintiff regarding this ADA accommodation request.** *See generally* **ECF No. 27-1.**

G. <u>Initiation of ADA Accommodation Request Process</u>

**On May 3, 2018, about eight months later, Amado sent Plaintiff a letter regarding a possible ADA accommodation for the SCBA unit use. [ECF No. 27-1 ¶ 146]. Engine 16 had begun transitioning to the X3 units in April/May 2018, and Amado's letter noted that with this transition it had "had come to the attention of the Office of Labor Relations that . . . [Plaintiff] may need a qualifying accommodation under the Americans with Disabilities Act (ADA)." [ECF No. 27-1 ¶ 146]. He included ADA request and medical release forms for Plaintiff to fill out, and explained that Plaintiff's accommodation request would "be reviewed once all forms are received." [ECF No. 27-1 ¶ 147& Ex. JJ (Amado's May 3, 2018 Letter)]. Plaintiff neither responded to this letter nor provided completed versions of any of the attached forms. [ECF No. 27-1 ¶ 148].**

14

Within two weeks, on May 16, Amado sent Plaintiff a follow-up letter with the same instructions and forms attached. [ECF No. 27-1 ¶ 149]. Amado followed this up with an email to Plaintiff the next day, May 17, noting the two letters he'd sent and asking to confirm that he had the right P.O. Box address. [ECF No. 27-1 ¶ 150]. Plaintiff sent an email reply that same day. She only acknowledged receipt of the May 3, 2018, letter and confirmed that Amado had the correct address. [ECF No. 27-1 Ex LL (May 17, 2018 Email Correspondence between Plaintiff and Amado)].

Amado replied later that day, reiterating that his office "will need the documents in order to proceed with this process," and asking Plaintiff to let him know if she had any questions. [ECF No. 27-1 Ex LL]. Plaintiff did not reply to this email.

Three months later, Amado sent a follow up on August 21, 2018, again reiterating: "if you wish to initiate a [sic] interactive process/dialogue under ADA, please complete the forms and forward to [us]." [ECF No. 27-1 Ex. MM (Amado's August 21, 2018, Email Correspondence with Plaintiff)]. Plaintiff replied four days later, on August 25, 2018, stating simply: "I am in receipt of your email, Mr. Amado." [ECF No. 27-1 Ex MM]. To date, Plaintiff has given none of the ADA forms for the SCBA accommodation request to Defendant. *See generally* ECF No. 27-1.

In a separate workers' compensation process for her shoulder injury, Plaintiff "argued to the Commissioner in informal hearings that she should be allowed to use the older Scott 75 model because it related to a work-related injury and workplace issues." [ECF No. 27-1 ¶ 162]. City of Bridgeport Attorney for the workers' compensation claim, Christine Yeomans, [ECF No. 27-1 ¶ 161],

"argued that the Workers Compensation Commission did not have jurisdiction over the matter because there were safety and labor issues involved," and told the Commissioner that Plaintiff "had made an ADA accommodation request. [ECF No. 27-1 ¶ 163].

Plaintiff filed the instant action with this Court on February 15, 2019. [ECF No. 1]. Defendant filed a motion for summary judgement on February 10, 2020. Plaintiff filed her opposition brief on April 9. [ECF No. 33]. Defendant replied on April 24. [ECF No. 35]. Plaintiff remains employed as a firefighter for Defendant. [ECF No. 27-1 ¶ 1].

## II, STANDARD OF REVIEW

A motion for summary judgement should be granted "if the movant shows that there is no dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a). The burden of proving that no factual issues exist falls on the moving party. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "A genuine issue of material fact is one that 'might affect the outcome of the suit under the governing law' and as to which 'a reasonable jury could return a verdict for the nonmoving party.'" *Noll v. Int'l Bus. Machines Corp.,* 787 F.3d 89, 94 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A district court ruling on a motion for summary judgement is "required to resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgement." *Kessler v. Westchester Cty. Dept. of Soc. Serv.*, 461 F.3d 199, 206 (2d Cir. 2006). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Liberty Lobby*,

477 U.S. at 255. If there is "any evidence from the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgement is improper." *Fischl v. Armitage*, 128 F.3d 50, 56 (2d Cir.1997) (quoting *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir.1997)).

### III. ANALYSIS

Defendant moves for summary judgement on all claims on the basis that Plaintiff (1) has failed to establish the prima facie case for failure to accommodate, and (2) is unable to recover because she was responsible for the breakdown in the RA/ADA's contemplated interactive process.

A. <u>Legal Standard for Failure to Accommodate Under the Rehabilitation Act</u>

Section 504 of the Rehabilitation Act of 1973 ("the Act") "prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against 'otherwise qualified' disabled individuals." *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (citing 29 U.S.C. § 794(a)). Because the standards for finding discrimination under both the Americans with Disabilities Act ("ADA") and the Act are "nearly identical," courts consider the merits of both types of claims together. *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012). Under both statutes, the "failure to make reasonable accommodations for one who is disabled can constitute discrimination." *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996) (addressing claims for failure to accommodate under both the ADA and RA).

Plaintiffs alleging a failure-to-accommodate claim of discrimination under the Act must first establish a *prima facie* case that the employer has refused a reasonable accommodation, after which point the burden shifts to the employer

to "demonstrate that the employee's proposed accommodation would result in an undue hardship." *Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 360 (E.D.N.Y. 2012) (citing *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)); 42 U.S.C. § 12112(b)(5)(A)) (ADA statute). A *prima facie* case of discrimination is established when the plaintiff demonstrates:

> (1) [the plaintiff] is a person with a disability under the meaning of [the statute in question]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019), *cert. denied*, 206 L. Ed. 2d 822 (Apr. 20, 2020) (citing *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)).

B. <u>Legal Standard for the Interactive Process Under the ADA/RA</u>

The determination of what constitutes a reasonable accommodation is often made through an "informal, interactive process" initiated by the employer "with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). Courts have considered "steps toward engaging in an interactive process" to include meeting with the employee requesting an accommodation, "request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered the employee's request, and offer[ing] and discuss[ing] available alternatives if the request is too burdensome." *Lovejoy-Wilson v. NOCO Motor Fuel , Inc.*, 263 F.3d 208, 218-19 (2d Cir. 2001) (alterations

in original) (quoting *Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142, 162 (3d Cir. 1999)).

An employer is only liable for failure to provide a reasonable accommodation if the employee is not responsible for the breakdown of the interactive process. *See, e.g., Moxley v. New York*, No. 1:17-CV-691, 2019 WL 5788440, at \*12 (W.D.N.Y. Nov. 6, 2019); *Bohen v. Potter*, No. 04-CV-1039S, 2009 WL 791356, at \*13 (W.D.N.Y. Mar. 23, 2009). As such, "[a]n employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate." *Moxley,* 2019 WL 791356, at \*12 (citing *Nugent v. St.-Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 946 (2d Cir. 2008) (summary order); *Winbush-Jones v. Potter*, No. 06-CV-6502 CJS, 2009 WL 497637, at \*10 (W.D.N.Y. Feb. 26, 2009) (same; quoting *Nugent*)).

While "no hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability," courts determining which party is responsible for the breakdown of an interactive process "attempt to isolate the cause of the breakdown and then assign liability." *Goonan v. Fed. Reserve Bank of New York*, 916 F. Supp. 2d 470, 480 (S.D.N.Y. 2013) [hereinafter *Goonan I*] (quoting *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130 (7th Cir. 1996)) *reconsideration denied*, 12–CV–3859 (JPO), 2013 WL 1386933 (S.D.N.Y. Apr. 5, 2013); *Craddock v. Little Flower Children & Family Servs. of N.Y.*, No. 12-CV-5062(JS)(GRB), 2016 WL 755631, at \*11 (E.D.N.Y. Feb. 25, 2016) (same; quoting *Beck*)*; Zito v. Donahoe*, 915 F. Supp. 2d 440, 446–47 (S.D.N.Y. 2012) (same; quoting *Beck*). Courts look for "signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific

accommodations are necessary." *Id.* Actions indicating bad faith can include "obstruct[ing] or delay[ing] the interactive process" and "fail[ing] to communicate, by way of initiation or response." *Id.* "'[W]hen presented with conflicting facts about the provenance of a breakdown,' courts must deny motions for summary judgment." *Goonan v. Fed Reserve Bank of N.Y.*, No. 12 CV-3859 JPO, 2014 WL 3610990, at *5 (S.D.N.Y. July 22, 2014) [hereinafter *Goonan II*] (collecting cases) (quoting *Goonan I*, 916 F.Supp.2d at 480).

### C. Plaintiff's First Asthma Claim

In her complaint, Plaintiff alleges that Defendant's decision to transfer her to Headquarters in August 2016 was "in clear violation of her rights under the Rehabilitation Act." [ECF No. 1 ¶ 27]. In its motion for summary judgement, Defendant argues that Plaintiff cannot establish the requisite prima facie case for failure to accommodate based on this claim because  (1) Defendant had no notice that working at Headquarters worsened Plaintiff's asthma, as required by the second element of the prima facie case, and (2) Plaintiff was accommodated when Defendant transferred her to Engine 10 two days later. [ECF No. 27 at 12-13].

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Coltin v. Corp. for Justice Mgmt., Inc.*, 542 F. Supp. 2d 197, 206 (D. Conn. 2008) (internal quotation marks omitted); *see also Olschafskie v. Town of Enfield*, No. 15-CV-67, 2017 WL 4286374, at *11 n.8 (D. Conn. Sept. 27, 2017). Plaintiff in the instant case does not oppose Defendant's argument that summary judgment on the Headquarters-transfer claim is appropriate. *See generally* ECF No. 33. The Court therefore considers

this claim to be abandoned by Plaintiff, and GRANTS Defendant's motion for summary judgment on this issue.

**D.** **Plaintiff's Second Asthma Claim**

Plaintiff alleges that Defendant violated the Act by failing to engage in the interactive process contemplated by the Act and by refusing her accommodation request to be transferred to Engine 16, or in the alternative, to remain in Engine 10 "with exclusion from the Bridgeport Fire Department sick leave and absence control policy." *See generally* ECF No. 34; ECF No. 27-1 ¶ 36. Defendant moves for summary judgement on both issues, arguing that there is no genuine dispute of material fact that (1) Plaintiff is the party responsible for the breakdown in the interactive process and (2) despite Plaintiff's failure to engage in the interactive process, Defendant provided a reasonable accommodation by offering to leave her in Engine 10. [ECF No 27 at 15-33].

**1.** **Alleged Failure to Engage in Interactive Process**

Defendant argues that Plaintiff "was not ready and willing to engage in the interactive process but in fact impeded that process by her refusal to provide the City with necessary information." [ECF No. 27 at 15]. Plaintiff, on the other hand, argues that Defendant has "concoct[ed] a falsehood in which it asserts that because the plaintiff did not sign [the] 'Consent to Release Information,' the defendant was delayed in responding to the plaintiff's request" and that the insistence on the form is "an obvious pretext to cover up" for Defendant's "failure to engage in an interactive process" with Plaintiff. [ECF No. 33 at 26].

After examining the undisputed facts and drawing all reasonable inferences in favor of Plaintiff, the Court cannot say that Defendant is entitled to

judgement as a matter of law that Plaintiff was the sole party responsible for the lack of an interactive process.  Mail delays notwithstanding, Plaintiff ultimately provided all forms requested by Defendant, save for the medical release, in a letter dated January 17, 2017. [ECF No. 27-1 ¶ 72]. In an email preceding the letter, Plaintiff reiterated her refusal to sign the medical release, indicating that her "physician has readily provided the ADA statement" and that she was "able to have him answer any direct medical questions that may arise during this process." *Id.* at ¶ 71. Defendant argues that:

> [i]t was entirely unclear to the City why assigning plaintiff to Engine 16 (her accommodation request) was better for her then [sic] her assignment to Engine 10 (the newest firehouse), and the City could not get any clarity on that issue because it could not communicate with plaintiff's doctor because plaintiff refused to sign and provide the City the Consent to Release Information form.

[ECF No. 27 at 26].

Further, Defendant argues that its employees "could not seek input and/or answers/information" on the allegedly numerous questions they had "by communicating with or receiving relevant medical documentation" from Plaintiff's doctor "because [P]laintiff refused to provide the City with the signed, 'Consent to Release Information' form." [ECF No. 27 at 23]. But Defendant cites no evidence demonstrating that it communicated its questions to Plaintiff.

In response, Plaintiff cites EEOC guidance on the interactive process that outlines two instances wherein employers cannot request medical documentation: "(1) when "both the disability and the need for reasonable accommodation are obvious, or (2) the individual has already provided . . . sufficient information to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested." [ECF No. 33 at 31]. Plaintiff argues that Defendant's "contention that the plaintiff barred it from speaking with her

doctor is a complete falsehood" and that "[t]he only restriction" that she "placed on future communications with her physician was that [it] relate to her request for an accommodation, the very same restriction placed on employers by the ADA," [ECF No. 33 at 29], when in her January 16 email she explained that she "still decline[d] to provide a medical release as . . . I am able to have him[, my physician,] any direct medical questions that may arise. . . ." [ECF No. 27-1 ¶ 21]. The Court finds that Plaintiff in this email effectively proposed an alternative means to engage in the interactive process, to which Defendants never responded. Plaintiff emphasizes that "it is inexplicable why Hawkins would not communicate with the plaintiff about her desire to raise these questions with Dr. Bachman." [ECF No. 34 at 10].

Courts find that an employer impedes the Act's interactive process when "the employer knows of the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith." *Moxley*, 2019 WL 5788440, at *12 (quoting *Kratzer v. Rockwell Collins, Inc.,* 398 F.3d 1040, 145 (8th Cir. 2005)). *See also Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 511 (N.D.N.Y. 2004) (collecting cases) (finding that significant delays in employer contact with employee raised a genuine dispute of material fact of whether the employer had acted in bad faith, therefore impeding the interactive process).

In the Second Circuit, an employer's insistence on further medical information after the employee has arguably already provided sufficient information has raised issues of fact over whether the employer is acting in good faith. In *Monterroso v. Sullivan & Cromwell, LLP,* the court in the Southern

District of New York examined whether an employee plaintiff seeking accommodations for asthma sufficiently engaged in the interactive process to recover for her employer's alleged failure to provide her a reasonable accommodation. 591 F. Supp. 2d 567, 581 (S.D.N.Y. 2008). At the defendant employer's request, the plaintiff had provided a doctor's note detailing a list of irritants that aggravated the plaintiff's asthma, had authorized her doctor to speak to her employer, and may have authorized her employer to access her IME, but the defendant continued to insist on more specific information. *Id.* at 575-76, 580-81. The court found that, in light of the most recent doctor's letter including a "detailed list of irritants . . . it is reasonable to infer that plaintiff could be accommodated by not being exposed to these irritants. It is not terribly difficult to make this logical leap." *Id.* at 581. The court therefore found that the question of whether the plaintiff "sufficiently engaged in the interactive process present[ed] a material question of fact" and refused to dismiss plaintiff's reasonable accommodation claim "on the ground that she failed to do so." *Id.*

In *Bohen v. Potter*, the court in the Western District of New York similarly faced a question of whether a defendant employer's insistence on additional medical information was justified, and whether the plaintiff employee's failure to provide it constituted sufficient responsibility for the breakdown in the interactive process to grant summary judgement in the defendant's favor. No. 2009 WL 791356, at *14 (W.D.N.Y. Mar. 23, 2009). The plaintiff had provided medical information for their foot injury in the past, and the plaintiff argued that his medical condition was "obvious" – he wore a bright blue surgical shoe and at one point was out of the office for over three months, for example, *id.* at *2, 15 – so further medical documentation was unnecessary. *Id.* Although the

24

defendant argued that its request for additional medical information on the plaintiff's foot was reasonable in light of the plaintiff's "last medical record on file, which indicated that Plaintiff could work without restrictions," the court ultimately denied its motion for summary judgement. *Id.* at *14. The court found, after "drawing every reasonable inference" in the plaintiff's favor, that there was "enough evidence on the record for a reasonable jury to find that [the d]efendant, not [the p]laintiff, was responsible for the breakdown in the process" due to its insistence on information that arguably wasn't necessary, and that because there was a "genuine issue as to who is responsible for obstructing the process, summary judgement [was] unwarranted." *Id.*

Of course, when the need for additional medical documentation is so clear that no reasonable jury could find that it was unnecessary for the employer to request it, courts will find that a plaintiff's refusal to provide it constitutes responsibility for the breakdown of the interactive process. *See, e.g., Economou v. Caldera*, No. 99–CIV–12117, 2000 WL 1844773 (S.D.N.Y.Dec.18, 2000), *aff'd* 286 F.3d 144 (2d Cir.2002) (finding that the plaintiff employee was responsible for the breakdown in the interactive process because the defendant employer's repeated requests for more detailed medical documentation, after a very brief doctor's letter initiated the request, were met with several similarly short and conclusory letters from the plaintiff's doctor). In *Boughton v. Town of Bethlehem*, the court in the Northern District of New York granted summary judgement to a defendant employer on the basis that the employee was responsible for the breakdown in the interactive process. No. 1:13-CV-01583, 2015 WL 5306077, at *11 (N.D.N.Y. Sept. 10, 2015). In *Boughton,* the defendant employer, after determining that the information provided by the plaintiff was insufficient to

tailor an accommodation for the plaintiff's supposed disability, asked the plaintiff to "provide more specific details concerning his restrictions and the appropriate accommodations for his alleged disability." *Id.* at *10. The employer was specific in this request, explaining that the "additional medical documentation should include an explanation of the length of time of outdoor exposure, acceptable weather conditions and temperatures." *Id.* The plaintiff provided a doctor's note that "failed to include acceptable weather conditions and temperatures," and the plaintiff, despite the "opportunity to acquire more specific information regarding his restrictions," failed to reply to the defendant's request. *Id.* The court found that because "no reasonable jury could find that it was the Defendant, rather than Plaintiff himself, who terminated the interactive process for discussing accommodations," by failing to provide the specifically requested information, the defendant was entitled to summary judgement. *Id.* at 11.

The Court notes at the outset a stark difference between the above cited cases and the one at bar: in every case above, the defendant employer contacted the employee to request more specific information after receiving initial information from the employee's doctor. The legitimacy of the alleged necessity of said information notwithstanding, the employers in the cited cases all engaged with their employees enough to, at a minimum, request more information. In the case of *Boughton*, the court found that the level of specificity in this request made the plaintiff's failure to provide additional medical information a decisive breakdown in the interactive process. 2015 WL 5306077, at *10-11. In the instant case, however, Defendant never reached out to Plaintiff to express its questions or that the information provided was deficient. Plaintiff

correctly notes that Defendant, "[f]aced with insufficient information . . . could have opted to send the plaintiff for an independent medical examination, or, at the very least, inform the plaintiff why the information was insufficient and allow her to provide sufficient information." [ECF No. 33 at 35].

In its reply, Defendant alleges that Plaintiff's refusal to sign the medical release constituted a "total restriction which prevented the City from communicating with her doctor about anything." [ECF No. 35]. The Court finds that Plaintiff's January 16, 2017 email stating that she was "able to have him [her doctor] answer any direct medical questions that may arise during this process," [ECF No. 27-1 ¶ 71] generates a genuine issue of material fact over whether this is the case: Plaintiff may have meant that she would allow Defendant to speak with her doctor after hearing its specific inquiries, or Plaintiff may have meant that she intended to act as an intermediary between her doctor and Defendant to prevent direct contact. Defendant could have asked Plaintiff's physician questions about Plaintiff's asthma, such as which allergens triggered it. It could have shared the results of its testing with Plaintiff's physiain to gain the understanding it admits it lacked. The fact that Defendant failed ot engaged Plaintiff to get answers to its questions is a strong indication from which a jury could infer that it abandoned rather than fully engaged in the interactive process that Plaintiff expressly invited. The mere existence of this ambiguity is enough to deny Defendant's motion for summary judgement on this issue. However, the Court reiterates that even if Plaintiff had intended to prevent direct contact with her Doctor, the breakdown in the interactive process cannot be said to fall squarely on Plaintiff because Defendant did not, after Plaintiff reiterated in her January 16 email that she did not see the need for the

medical release, engage the Plaintiff to explain why this was a problem. *See generally* ECF No. 27-1.  Summary judgment on this issue is therefore improper.

In addition to Defendant's failure to notify Plaintiff that the medical information she provided was insufficient, the Court finds there is also a genuine issue as to whether additional information was necessary. Defendant, on March 17, 2017, in response to Plaintiff's inquiry into the status of her request, notified Plaintiff that her disability did qualify under the ADA, which raises a genuine issue of whether additional information was necessary. [ECF No. 27-1 Ex. Y]. Similar to the plaintiff in *Monterroso,* Plaintiff in the instant case provided a medical note stating what the medical issue was and how to accommodate it: that Plaintiff's asthma was worse since transferring from Engine 16, and that she should be relocated back to Engine 16 because her condition was better there. [ECF No. 27-1 Ex. V].  A genuine issue of fact therefore exists regarding whether this information was sufficient, and drawing all inferences in Plaintiff's favor a reasonable jury could find that it was Defendant's bad faith, rather than Plaintiff's failure to provide additional, unrequested information, that caused the breakdown in the interactive process.

In its motion for summary judgment, Defendant cites three additional cases to support its claim that Plaintiff's refusal to sign the medical release constitutes responsibility for the breakdown of the interactive process, barring recovery. The Court finds none to be persuasive. First, Defendant cites *Lorius v. Amedisys Holding, L.L.C.* No. 3:17 CV 292 (WWE), 2018 WL 5268116, at *5 (D. Conn. Oct. 23, 2018). [ECF No. 27 at 19]. But in *Lorius,* the defendant employer is granted summary judgement not on the basis that the plaintiff employee had failed to engage in the interactive process but rather because the plaintiff failed

to establish that their requested accommodation was in fact reasonable. *Lorius,* 2018 WL 5268116 at *5. Defendant then cites *Christina v. Chubb & Son, Inc.,* No. 3:14 CV 1062 (WWE), 2016 WL 5420564, at *5 (D. Conn. Sept. 27, 2016). While the court in *Christina* did grant summary judgment to the defendant employer on the basis that the plaintiff employee failed to submit the required medical documentation to meet the defendant's request, it is merely another example of a defendant, unlike Defendant in this case, who engaged the plaintiff to request additional information. *Christina,* 2016 WL 5420564 at *2, *5. While it is true Defendant did not understand why transfer was a reasonable accommodation, it did not understand because it failed to engaged in the interactive process by failing to explain the basis of its confusion to Plaintiff's physician or to request further information form Plaintiff, though she offered to provide it. Finally, Defendant also cites *Goos v. Shell Oil Co.,* 451 Fed. App'x 700 (9th Cir. 2011). In addition to being an out-of-circuit, unpublished opinion, this case too is distinguishable and unpersuasive. In *Goos,* the court had access to the full trial record, which revealed substantial evidence of the plaintiff's bad faith participation in the interactive process outside the mere fact that she had barred her physician from speaking to the defendant. *Goos,* 451 Fed. App'x at 702. In the instant case, there is no such evidence and the Court therefore finds *Goos* to be unpersuasive.

Finally, in its reply, Defendant asserts that the interactive process was interrupted not by the actions of the City, but by Plaintiff, when pursuant to her union contract, she bid to fill a vacancy at Engine 16. [ECF No. 35 at 4]. The Court does not find this persuasive. Drawing all reasonable inferences in favor of Plaintiff, the Court finds that by transferring to Engine 16 as soon as she was

able, Plaintiff was doing all she could to remove herself from the conditions at Engine 10 that were allegedly causing her health issues. Because Defendant can, and does, transfer employees to different engines "based on operational needs of the department" several times a year, absent a formal recognition from Defendant that Plaintiff should remain in Engine 16, Plaintiff still needed the interactive process to continue. This is further supported by Plaintiff's continued interest in the status of her accommodation request, as evidenced by her August 2017 email to Amado. [ECF No. 27-1 Ex. NN]. It is therefore a genuine issue of material fact whether Plaintiff's actions to transfer herself to Engine 16 truly constitutes an abandonment of the process, and Defendant is not entitled to summary judgment on this argument.

For the above reasons, Defendant is not entitled to judgement as a matter of law and summary judgment on this issue is DENIED.

### 2.  Alleged Provision of Reasonable Accommodation

Defendant alleges that Plaintiff "cannot prove a prima facie case under the ADA, especially that the City refused to accommodate her." [ECF No. 27 at 33]. Defendant concedes the first element of Plaintiff's *prima facie* case, denying the rest. *Id.* at 5. However, the entirety of Defendant's argument against Plaintiff's case falls on the final element of refusal to accommodate. *See generally* ECF No. 27. The Court too will therefore focus its analysis there. Plaintiff disagrees that Defendant provided a reasonable accommodation, arguing instead that Defendant "unilaterally reject[ed]" her request "without discussion" with her. [ECF No. 33 at 54].

Under the ADA, an accommodation is reasonable if it is one that "enable[s] an individual with a disability who is qualified to perform the essential functions

of that position ... [or] to enjoy equal benefits and privileges of employment." *Noll,* 787 F.3d at 94 (alterations in original) (quoting 29 C.F.R. § 1630.2(o )(1)(ii), (iii)). While the reasonableness of an accommodation "often must be resolved by a factfinder," a defendant can succeed on a motion for summary judgement if the undisputed record shows that the accommodation provided is "plainly reasonable." *Id.* This is achieved by establishing that the accommodation provided was effective. *Id.* at 95.

In *Noll*, the Second Circuit upheld the district court's grant of summary judgement to the defendant employer because the accommodation the defendant provided, while not the one requested by the plaintiff employee, was effective, and therefore plainly reasonable. 787 F.3d at 98. The plaintiff was a deaf software engineer who often requested accommodations to access material on the defendant's corporate intranet, which contained a "huge volume of video and audio files in a number of locations, with thousands of files . . . continuously being uploaded." *Id.* at 93. The accommodations already provided by the defendant included "ASL interpreters who provided real-time translation services, either on-site or remotely, for intranet content as well as for live meetings." *Id.* The defendant therefore refused to provide the plaintiff with his request that "at the time they are posted, all intranet videos be captioned and all audio files have transcripts." *Id.* The court found that the provision of the ASL interpreters was plainly reasonable because they were effective in enabling the plaintiff to access the videos, and that the plaintiff's sole objection "that he had to look back and forth between an interpreter and his screen—did not, without *more*, make that accommodation unreasonable." *Id.* at 97 (emphasis added).

31

In *Durick v. New York City Department of Education*, the court in the Eastern District of New York, in relevant part, denied the defendant employer's motion for summary judgement on the issue of the accommodations it had offered to the plaintiff employee was plainly reasonable. 202 F. Supp. 3d 277, 292 (E.D.N.Y. 2016). The plaintiff had requested that she be able to park at the rear of the school building in order to "avoid steps and take the shortest distance to the entrance." *Id.* at 291. Like in *Noll*, the defendant in this case offered the plaintiff two options that were already available to the plaintiff when she made the request: to "use the stairs at the faculty entrance, or [to] use the ramp at the main entrance. Neither option changed her parking space to put her closer to the entrance she desired at the rear of the school, which did not have a long ramp or stairs." *Id.* The court differentiated this case from that of *Noll*, finding that unlike the plaintiff in *Noll* whose sole objection to an otherwise effective accommodation was the inconvenience of looking between an interpreter and the computer screen, the plaintiff in this case alleged that the walk from her current parking space, with the accommodations offered, was "'brutal' and 'wrecked' [the] plaintiff for the rest of the day." *Id.* The court therefore found that there was a genuine dispute of material fact as to whether or not these alternative accommodation offers were effective and denied the defendant's motion for summary judgement on that issue. *Id.* at 92.

The present case is more similar to that of *Durick* than *Noll*: asthma attacks are more severe than the mere inconvenience of looking between a person and a screen. Although Defendant argues that its decision to "find[] the firehouse with the least allergens and assign[] the plaintiff there is an entirely reasonable accommodation," the Court finds that there is a genuine dispute of

fact over whether this is actually the case. [ECF No. 27 at 30]. The simple matter is that Plaintiff, while in Engine 10, made a request to be either transferred out, or to remain with exceptions to the sick policy, because *the conditions there* aggravated her asthma. The decision to leave Plaintiff in the very place where the alleged problems arose is not "plainly reasonable," and its effectiveness is dubious at best. Making all reasonable inferences in favor of Plaintiff, the Court finds that the Plaintiff's allegation that she had "seven year[s of] freedom from disabling asthma attacks while at Engine 16," and the provision of "her doctor's medical opinion that the plaintiff should be assigned to Engine 16," is enough to raise a genuine dispute of material fact of whether the decision to disregard Plaintiff's accommodation request, without a dialogue getting there, is an effective accommodation. [ECF No. 33 at 30].

Furthermore, the Court finds it difficult to believe that Defendant can claim the accommodation it provided is reasonable without having properly engaged in the interactive process. The intention behind this process is to tailor the accommodation to the employee's needs, and it is impossible for Defendants to do this without a better understanding of what these are: what are Plaintiff's asthma triggers? What does her doctor think of the air test results? In the absence of any discussion with Plaintiff and any efforts by Defendant to ascertain this information, the Court cannot find this to be a plainly reasonable accommodation. Defendant's motion for summary judgement on this issue is therefore DENIED.

E.  <u>Plaintiff's Shoulder Claim</u>

Plaintiff again alleges that Defendant violated the Act by both failing to engage in the interactive process and refusing to provide a reasonable

accommodation in response to her request. [ECF No. 33 at 54]. Defendant responds that it is entitled to judgement as a matter of law because there is no genuine dispute of material fact that (1) Plaintiff was responsible for the breakdown in the interactive process and (2) Plaintiff cannot establish the requisite *prima facie* case for refusal to accommodate. [ECF No. 27 at 34].

### 1. Interactive Process

Defendant argues that Plaintiff "utterly failed to engage in any interactive process regarding her accommodation request involving the SCBA units." [ECF No. 27 at 34]. Plaintiff instead argues that "it was the defendant that never initiated the process." [ECF No. 34 at 47]. After examining the submitted exhibits and undisputed facts, and drawing all reasonable inferences in Plaintiff's favor, the Court finds there is no genuine dispute of material fact that the responsibility for the lack of interactive process falls on Plaintiff for this issue.

In determining fault for the breakdown of the interactive process, courts must first "attempt to isolate the cause of the breakdown and then assign liability." *Goonan*, 916 F. Supp. at 480 (quoting *Beck*, 75 F.3d at 1130). This of course requires determining when the interactive process actually began. *See, e.g., Moxley*, 2019 WL 5788440 at *15 (finding that delays by defendant employer to reply to preliminary correspondence about a disability did not establish responsibility for the interactive process's breakdown because they occurred before the plaintiff employee's formal request for an accommodation). Once the interactive process is initiated and the breakdown is isolated, courts can examine if there is enough undisputed evidence on a motion for summary judgement to say as a matter of law which party bears the responsibility for said breakdown.

Plaintiff argues that her email to Deputy Chief Edwards on August 23, 2017 constituted a request for an accommodation, but that Defendant never initiated the interactive process. The Court finds, however, that the interactive process was in fact initiated by Defendant when, in the face of Engine 16's transition to the use of X3 units some eight months later, Defendant sent Plaintiff a letter on May 3, 2018 acknowledging Plaintiff's potential need for an accommodation and attaching the forms necessary for Defendant to initiate the process of providing one. [ECF No. 27-1 ¶ 146]. Though Plaintiff does point out the unexplained eight-month gap between this formal initiation of the interactive process and her initial email, this does not change the Court's determination that the interactive process was formally initiated by Defendant's May 3 letter. [ECF No. 33 at 15]. Defendant's letter, and subsequent attempts at contact, made it clear that the interactive process would continue once the forms were received. *See* ECF No. 27-1 Ex JJ.

Plaintiff does not allege that the eight-month period between her request and the formal initiation of the process was injurious. *See generally* ECF No. 33. Moreover, the Court finds that this eight-month period does not constitute a delay in the interactive process. Plaintiff was not using the X3 when she requested an accommodation from Edwards and her speculations that she may be asked to do so did not come to pass. *See generally* ECF NO. 27-1; ECF No. 34. Deputy Chief Edwards's attempts at getting more information from Plaintiff's doctor during this period were stymied by Plaintiff's worker's compensation attorney's bar on contact. [ECF No. 27-1 ¶ 143]. When Plaintiff was finally required to use the X3 units in April/May 2018, Defendant contacted her on May 3 to initiate the ADA accommodation process. [ECF No. 27-1 ¶ 145-46].

Courts find that an employee was responsible for the breakdown in the interactive process if they fail to respond to their employer's communications. *See, e.g., Tillman v. Verizon New York, Inc.*, 118 F. Supp. 3d 515, 522 (E.D.N.Y. 2015) (granting summary judgment to defendant employer because the plaintiff employee failed to contact defendant and follow the procedures, clearly articulated to the plaintiff on numerous occasions, to request an accommodation and provide documentation); *Amador v. Macy's E.-Herald Square*, No. 12 CV. 4884 MHD, 2014 WL 5059799, at *29 (S.D.N.Y. Oct. 3, 2014) (granting summary judgment to defendant employer where undisputed record established that plaintiff employee never provided the requested documentation for the accommodation request nor accepted defendant's offers granting her additional time to gather it); *Winbush*-Jones, 2009 WL 497637, at *11 (granting summary judgment to defendant employer because of plaintiff employee's continued failure to contact defendant to request further accommodations despite defendant's invitation to do so).

In *Zito v. Donahoe*, the court in the Southern District of New York determined that the plaintiff employee was responsible for the breakdown in the interactive process and granted summary judgement to the defendant employer. 915 F. Supp 2d at 447-48. The plaintiff in this case failed, despite "numerous requests" from the defendant, to provide documentation supporting his accommodation request, "despite ample time to acquire" it. *Id.* at 448. The court found that the undisputed record of numerous requests by the defendant that went unanswered by plaintiff left no question that the plaintiff was responsible for the breakdown. *Id.*

The instant case is no different from those outlined above: Defendant initiated the formal ADA accommodation request process by sending Plaintiff the forms required on May 3, 2018, when Engine 16 began using the X3 units that Plaintiff had alleged aggravated her disability. [ECF No. 27-1 ¶ 145-46]. This letter explained that the accommodation process would begin once it received the forms back from the Plaintiff. [ECF No. 27-1 Ex JJ]. In the face of Plaintiff's failure to provide any of the forms, nor challenge their necessity, Defendant followed up three times, by both mail and email, and to date has neither received the forms nor any correspondence from Plaintiff claiming they aren't necessary. *See generally* ECF No. 27-1. The undisputed record clearly shows that once Defendant initiated the interactive process to request documentation to work towards a reasonable accommodation, Plaintiff did not engage Defendant at all except to state that she had received the documents. *See* ECF No. 27-1 Ex LL; MM. If Plaintiff believed that the forms requested numerous times by the Defendant were unnecessary or contrary to EEOC guidance as she alleges in her opposition motion, the onus was on her to engage with Defendant to challenge the forms' necessity. Just like Defendant failed to engage Plaintiff to communicate their desire to speak with Plaintiff's doctor about her asthma accommodation request, Plaintiff utterly failed here to engage Defendant in any dialogue about her disagreement regarding the appropriateness of the ADA forms. Given this fact, no reasonable jury could find that it was Defendant, and not Plaintiff, who was responsible for the utter lack of interactive process on this issue.

Plaintiff's arguments that the ADA forms requested by Defendant do not follow ADA procedures do not change the Court's determination. Indeed, the

plaintiff in *Zito* made a similar argument in challenging the defendant's initiation of the process as being in violation of the company policy. Even accepting this argument, the *Zito* court's decision to grant summary judgement in favor of the defendant did not change: violation of policy or not, the plaintiff had failed to dispute that the intention behind the defendant's requests was to "gather the information necessary for determining the appropriate accommodation for [the plaintiff's] disability." *Zito*, 915 F. Supp 2d at 448. The court held that the employer's "initiation of an interactive process, albeit by an improper procedure, could not, as a matter of law, constitute a breakdown of the interactive process" and granted summary judgment to the defendant. *Id.* at 448. Plaintiff in the instant case never responded to Defendant's numerous requests by challenging the validity of the documents, nor by referring Defendant to any other available medical information in lieu of the ADA Physician Statement. *See generally* ECF No. 27-1. The undisputed record shows that Defendant's attempts to engage the plaintiff to initiate the process of providing an accommodation went substantially unanswered, and the Court therefore finds that there is no genuine dispute that Plaintiff is responsible for the breakdown in the interactive process. Defendant is therefore entitled to summary judgement as a matter of law and its request for this claim is GRANTED.

2.  **Plaintiff's *Prima Facie* Case of Failure to Accommodate**

Because this Court has determined that there is no genuine dispute of material fact with regards to Plaintiff's responsibility for the ultimate breakdown in the interactive process, it need not reach the merits of Plaintiff's *prima facie* case for refusal to accommodate. "[A]n employee who is responsible for the breakdown of that interactive process may not recover for a failure to

accommodate." *Moxley,* 2019 WL 791356, at \*12 (citing *Nugent*, 303 F. App'x at 946). Defendant is therefore not liable for any alleged failure to accommodate Plaintiff's shoulder injury and the Court finds it entitled to judgement as a matter of law. Defendant's request for summary judgement on this issue is GRANTED.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgement, [ECF No. 27], is GRANTED in part, and DENIED in part.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District of Connecticut

Dated: August 10, 2020 at Hartford, Connecticut